UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
REMCODA, LLC,

                *Plaintiff*,

        -against-

DAVID SUMNER, SUMNER GROUP HEALTH LIMITED, ROBERT EKSTEDT, GLOBAL HEALTH SUPPLY, LLC, EKSTEDT ENTERPRISES LLC, ITS NANOED, INC., GENTRY BEACH, ADAPTIV RESEARCH & DEVELOPMENT GROUP LLC d/b/a ADAPTIV BIOMED, and ENCORP. SWITZERLAND AG,

                *Defendants*.

------------------------------------------------------------------X

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Remcoda, LLC ("Plaintiff"), by its attorneys, Oved & Oved LLP, complaining of Defendants David Sumner ("Sumner"), Sumner Group Health Limited ("Sumner Group Health"), Robert Ekstedt ("Ekstedt"), Global Health Supply, LLC ("Global Health"), Ekstedt Enterprises LLC ("Ekstedt Enterprises"), Its Nanoed, Inc. ("Nanoed"), Gentry Beach ("Beach"), Adaptiv Research & Development Group LLC d/b/a Adaptiv Biomed ("Adaptiv"), and ENcorp. Switzerland AG ("EN Corp.") alleges as follows:

### NATURE OF ACTION

      1.     As the fourth wave of the COVID-19 pandemic swept through the country and tens of millions of people desperately sought COVID-19 tests, Plaintiff agreed to procure and provide certain COVID-19 at-home testing kits for a large, nation-wide supermarket chain to sell to its customers.

      2.     In late December 2021, Plaintiff was introduced to Sumner and Ekstedt, who represented that they and their respective companies, Sumner Group Health and Nanoed, had

significant experience in selling COVID-19 tests and related COVID-19 protective products. Sumner and Ekstedt repeatedly assured Plaintiff that they jointly owned 4.1 million at-home testing kits that would meet Plaintiff's requirements and would be immediately available for Plaintiff to take possession. Based on these representations, on December 28, 2021, Plaintiff paid to Defendants $1,130,220 and, pursuant to Defendants' representations, expected Defendants to perform by delivering the bargained-for goods on December 29, 2021, as promised.

3. Plaintiff did not receive the goods by December 29, 2021. After obfuscating for nearly one week, Plaintiff learned that Sumner, Ekstedt, and their entities had placed Plaintiff's order through EN Corp. and Adaptiv, and Sumner directed Plaintiff to contact Adaptiv to discuss fulfillment. In other words, Ekstedt's and Sumner's representations that they owned 4.1 million COVD-19 tests and could immediately deliver tests to Plaintiff were obviously false. For their part, Adaptiv and EN Corp. breached their agreements and Adaptiv, its officer Beach, and EN Corp. continued to advance the fraud by making numerous false representations to Plaintiff that Plaintiff relied upon in dealing with its customer, including that the test kits had shipped and would be delivered to Plaintiff. Like the statements from Sumner and Esktedt, the representations from Beach, Adaptiv and EN Corp. were knowingly false.

4. It is plainly apparent that Defendants did not own the COVID-19 test kits and, thus, wholly lacked the ability to perform as promised. Rather, Defendants jointly engaged in an orchestrated scheme to defraud Plaintiff into paying them over one million dollars, including by repeatedly providing fraudulent information and documents, making false promises, and hiding behind a web of interrelated shell companies, with the sole intention of misappropriating Plaintiff's funds.

5. Accordingly, Plaintiff brings this action to recover its payment to Defendants, lost profits, and out of pocket expenses resulting from Defendants' fraud, breaches of contract, and other misconduct.

**PARTIES**

6. Plaintiff is a New York limited liability company and has a principal place of business in New York, New York. Plaintiff's four members are citizens of New York, Florida and California.

7. Defendant David Sumner, upon information and belief, is a citizen of the United Kingdom and Chief Executive Officer of Sumner Group Health.

8. Defendant Sumner Group Health Limited, upon information and belief, is a private limited company organized under the laws of the United Kingdom with a principal place of business in Hampshire, England.

9. Defendant Robert Ekstedt, upon information and belief, is a citizen of Montana who presently lives in a rental property in Las Vegas, Nevada, and is the President of Nanoed, the managing member of Ekstedt Enterprises, and controls Global Health.

10. Defendant Global Health Supply, LLC, upon information and belief, is a Nevada limited liability company with a principal place of business at 11313 Altura Vista, Las Vegas, Nevada. Ekstedt, and, upon information and belief, controls Global Health through its purported managing member, Ekstedt Enterprises. Upon information and belief, Global Health's two members are citizens of Montana and/or Nevada.

11. Defendant Ekstedt Enterprises, LLC, upon information and belief, is a Nevada limited liability company with a principal place of business at 11313 Altura Vista, Las Vegas, Nevada. Ekstedt, upon information and belief, is the manager of Ekstedt Enterprises and one of three members, each of whom is a citizen of Nevada or Montana.

12. Defendant Its Nanoed, Inc., upon information and belief, is a Delaware corporation with a principal place of business in Las Vegas, Nevada.

13. Upon information and belief, at the direction of Ekstedt, each of Nanoed, Global Health, and Ekstedt Enterprises (collectively, the "Ekstedt Entities"), use each other's funds and assets for their own purposes and for the personal benefit of Ekstedt, and do not treat each other as independent profit centers. The Ekstedt Entities, upon information and belief, do not have independent business discretion and are dominated and controlled by Ekstedt, freely commingle funds among each other, do not deal with each other at arm's length, pay the debts and guarantee the obligations of each other, and interchangeably use each other's property as if it were their own. Moreover, the Ekstedt Entities share office space, personnel, and employees, including Jenny Capri and Ekstedt. In short, the Ekstedt Entities and Ekstedt are classic alter egos.

14. Defendant Gentry Beach, upon information and belief, is a citizen of Texas residing at 4416 Belclaire Avenue, Dallas, Texas and is an officer of Adaptiv.

15. Defendant Adaptiv Research & Development Group LLC d/b/a Adaptiv Biomed, upon information and belief, is a Tennessee limited liability company with a principal place of business in Memphis, Tennessee, whose members are citizens of Tennessee and North Carolina.

16. Defendant ENcorp. Switzerland AG, upon information and belief, is a Swiss limited company with a principal place of business in Zug, Switzerland.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are domiciled in different states and countries, and the amount in controversy exceeds $75,000.

18. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

**FACTS**

A. **Defendants' Scheme to Fraudulently Induce Plaintiff**

19. As the fourth wave of the COVID-19 pandemic raged in December 2021, Plaintiff agreed to provide at-home COVID-19 test kits to a large, nationwide supermarket chain.

20. On December 27, 2021, Plaintiff was introduced to Sumner and Ekstedt. During a telephone call later that day between Plaintiff, Sumner, Ekstedt, and others, Sumner represented to Plaintiff that he was the head of Sumner Group Health and had extensive experience in supplying personal protective equipment and at-home COVID-19 tests, including through several very large government contracts. Ekstedt represented that he was the head of Nanoed and touted his extensive experience in supplying products designed to protect against COVID-19.

21. During the December 27 telephone call, Plaintiff advised Defendants that it needed certain COVID-19 tests kits to provide to its customer and that time was of the essence to fulfill Plaintiff's obligations to its customer. To induce Plaintiff to purchase the test kits from Defendants, Sumner represented that he and Sumner Group Health had partnered with Ekstedt and his company, Nanoed, and that, Sumner, through his entity, owned 4.1 million iHealth at-home Covid-19 test kits (the "Tests") that were stored at iHealth's California warehouse and available for immediate sale and delivery to Plaintiff. Indeed, Ekstedt represented to Plaintiff that the Tests Plaintiff needed would be ready for immediate pick up on the same day that Sumner Group Health received Plaintiff's payment.

22. Plaintiff was aware that that the market for at-home COVID-19 test kits was exceptionally tight and Plaintiff was only willing to deal with a supplier that could provide the Tests as soon as payment was made. Thus, Defendants' representations of outright ownership of the Tests and that Plaintiff could immediately pick up the Tests were material in inducing Plaintiff to enter into the transaction with Defendants. Nonetheless, Plaintiff advised Defendants during

the December 27, 2021 telephone call that Plaintiff was concerned that it would take days to complete the wire of funds overseas from Plaintiff's New York bank account to Sumner Group Health's United Kingdom bank account, which would serve to delay Plaintiff's ability to pick up the Tests and deliver them to its customer.

23. During the December 27, 2021 telephone call, Defendants acknowledged Plaintiff's concerns and proposed a purported solution. Specifically, Sumner and Ekstedt advised Plaintiff to wire the funds to Global Health the next day (December 28, 2021). When Plaintiff asked who Global Health was, Sumner and Ekstedt represented that Global Health was an affiliate of Ekstedt and that it had a United States bank account, which could be used to expedite the transaction. When pressed, Sumner and Ekstedt confirmed that they were partners in this transaction together and that Sumner, Ekstedt, Sumner Health Group, and Nanoed stood behind the deal and would ensure Plaintiff a quick and seamless transaction. Indeed, Sumner expressly represented that Plaintiff could pick up the Tests at iHealth's California warehouse "within 30 minutes" of Plaintiff sending the wire.

24. Unknown to Plaintiff at the time, Defendants' representations were false and Defendants, including Sumner and Ekstedt, knew that they were false when made.

25. Indeed, despite Defendants' representations, Defendants did not own any Tests stored at iHealth's California warehouse and thus, could not possibly supply them to Plaintiff. Rather, Defendants, at all times, intended to enrich themselves at Plaintiff's expense by inducing Plaintiff to pay them, and, upon information and belief, then funneling Plaintiff's funds offshore to divide them among Defendants while never providing the Tests to Plaintiff.

26. Relying on Defendants' representations and unaware of their falsity, Plaintiff agreed to Defendants' proposal. On December 28, 2021, pursuant to Defendants' instructions

given during the parties' earlier telephone call, Plaintiff issued a purchase order to Global Health for 98,280 Tests at a per unit price of $11.50, for a total purchase price of $1,130,220. In keeping with Defendants' representations, the purchase order reflected that Plaintiff would pick up the Tests from iHealth's California warehouse "upon payment," and that Global Health would provide a full set of bills of lading, commercial invoice, and a detailed packing list of goods shipped from the manufacturer indicating quantity, gross weight, and net weight.

27. Later that same day, on December 28, 2021, Global Health provided Plaintiff with a corresponding invoice, reflecting that Global Health would supply 98,280 Tests at a per unit price of $11.50, for a total purchase price of $1,130,220. The invoice also reflected Defendants' representation that the Tests would be ready for pick-up at the estimated time of "8AM PST ON WED 12/29/21," *i.e.*, the next day.

28. On December 28, 2021, Plaintiff wired $1,130,220 from its New York bank account to Global Health and Defendants were required to have the Tests available for Plaintiff to pick up from iHealth's California warehouse on December 29, 2021.

B. **Defendants Continue to Defraud Plaintiff to Cover Their Misconduct**

29. With over $1.13 million of Plaintiff's funds now in their possession, Defendants continued their scheme to defraud Plaintiff to cover their misconduct while they, upon information and belief, channeled funds among entities they control and hinder Plaintiff's recovery.

30. In accordance with Defendants' representations and instructions, on December 29, 2021, Plaintiff hired and sent a truck to iHealth's California warehouse to pick up the Tests. The warehouse, however, advised that it was unaware of the order and did not have any Tests owned by Defendants, nor any Tests available to provide to Plaintiff based on its transaction with Defendants.

31. Plaintiff immediately suspected that Defendants had defrauded it and, on December 29, 2021, Plaintiff called Ekstedt. During the telephone call, Ekstedt represented to Plaintiff that there had been a "miscommunication" and that Defendants would cause the Tests to be shipped directly to Plaintiff's customer at Defendants' own cost. Ekstedt further represented that Defendants would provide Plaintiff with shipping documents immediately.

32. On December 29, 2021, Plaintiff also contacted Sumner, who represented that he had "checked and it [the Tests] will be out for delivery today."

33. By December 30, 2021, Defendants had still failed to provide Plaintiff with any shipping documents and had also failed to ship any Tests. As such, on December 30, 2021, Plaintiff demanded an immediate status update and that it be provided with the promised shipping documents or that Plaintiff would commence legal action. Sumner replied that the Tests would be shipped out later that day and, if they were not, Sumner would cause Plaintiff's money to be fully refunded pursuant to wire instructions provided by Plaintiff. Later on December 30, 2021, at 8:11 p.m., Sumner again represented to Plaintiff that the shipping documents would be sent to Plaintiff "within the hour" and that the delivery of the Tests would be "all sorted today."

34. Despite Sumner's representations, Defendants failed to provide any shipping documents "within the hour," or at all, and further failed to ship the Tests by December 31, 2021.

35. On the verge of losing its customer, associated profits, and the over $1.13 million it wired to Defendants, on December 31, 2021, Plaintiff demanded that Defendants refund its payment and threatened immediate legal action.

36. Undeterred by Defendants' consistent failure to deliver on any of their multiple promises to Plaintiff, on December 31, 2021, Ekstedt attempted to prolong the charade by responding to Plaintiff with numerous excuses, including his boast that he "closed another 30

million kits today," and again affirmatively represented that the Tests "will go out in the morning." Ekstedt further represented that if Plaintiff no longer wanted to move forward with the transaction, "I will have stop [sic] the truck and process your refund. No worries!" In response, Plaintiff confirmed that Defendants should immediately wire a full refund back to Plaintiff to avoid immediate legal action.

37. A few hours later on December 31, 2021, Ekstedt represented to Plaintiff during a telephone discussion that the Tests were being delivered to Plaintiff's customer by FedEx freight and Ekstedt committed to provide the FedEx tracking information immediately. To forestall Plaintiff's threats of immediate legal action and, upon information and belief, to create time to allow Defendants to transfer all of Plaintiff's funds abroad to hinder Plaintiff's recovery, Ekstedt promised that if Defendants did not provide the FedEx tracking information, Defendants would immediately wire Plaintiff a full refund. These promises, too, turned out to be lies.

38. Despite Defendants' numerous representations and repeated demands by Plaintiff, Defendants failed to provide FedEx tracking information to Plaintiff, failed to deliver the Tests, and have failed to refund Plaintiff's payment.

39. On January 3, 2022, in an attempt to resolve this matter, Plaintiff's counsel sent a draft version of this Complaint to Sumner and Ekstedt with a demand that Defendants comply with their obligations to avoid a lawsuit.

40. This only resulted in Defendants engaging in additional blatant fraudulent conduct in a last-ditch effort to delay litigation and, upon information and belief, allow Defendants to finalize their transfer of Plaintiffs funds abroad and to other entities.

41. On January 4, 2022, Sumner sent to Plaintiff a supposed bill of lading from a trucking company purporting to show that the Tests would be shipped from a California warehouse to Plaintiff by January 5, 2022.

42. Notably, the warehouse from which the Tests would supposedly be shipped was <u>not</u> the iHealth warehouse where Defendants represented that they stored the 4.1 million Tests that they supposedly owned.

43. The bill of lading, however, was fraudulent.

44. On January 5, 2022, Plaintiff confirmed with the warehouse from which the Tests would supposedly ship that they did not have any such Tests and that no such orders had been placed. Yet again, Defendants confirmed their true colors and simply lied to Plaintiff.

C. **Beach, Adaptiv and EN Corp. Try to Advance the Fraud**

45. Later on January 5, 2022, Sumner again changed his story and now advised that Adaptiv would deliver the Tests to Plaintiff and instructed Plaintiff to contact Beach, an officer of Adaptiv, to coordinate logistics.

46. When Plaintiff pressed Sumner on why Adaptiv would be delivering the Tests, Sumner now claimed that he and Ekstedt, through their entities, placed an order for the Tests with Adaptiv pursuant to which Adaptiv would fulfill at least part of Plaintiff's order and that Adaptiv now held at least some of Plaintiff's funds.

47. Plaintiff was shocked to discover that Adaptiv was now somehow involved in fulfilling Plaintiff' order for Tests. Indeed, prior to speaking with Sumner and Ekstedt, Plaintiff discussed procuring COVID-19 test kits with Adaptiv, but had understood that Adaptiv would take weeks or even months to fulfill Plaintiff's order. This was precisely the reason Plaintiff contracted with Sumner's and Ekstedt's entities to procure the Tests after receiving Sumner's and Ekstedt's

representations that they directly owned the Tests and could therefore deliver the Tests immediately. Dejected, but desperate to fulfill its order to its customer, Plaintiff contacted Beach at Sumner's urging.

48. On January 5, 2022, Beach told Plaintiff that Adaptiv had actually received some of Plaintiff's funds from an entity called EN Corp., who Beach understood had received the funds from Sumner and Ekstedt and was obligated to provide the Tests to Plaintiff. Beach then represented to Plaintiff that Adaptiv would fill Plaintiff's entire order and that Plaintiff would receive the entire amount of Tests that it ordered by January 6.

49. Yet again, Defendants lied to Plaintiff. Plaintiff received only 30,240 Tests from Adaptiv – a small fraction of the overall amount Defendants had promised to deliver. Moreover, the Tests arrived from Adaptiv's warehouse, again confirming that Sumner's and Ekstedt's representations that they directly owned the Tests that they would provide to Plaintiff were false.

50. Plaintiff continued to contact Sumner and Beach to obtain an update on the outstanding balance of its order and to understand when (or if) the remainder of the Tests would be provided. On January 11, 2022, Beach purported to confirm to Plaintiff that the balance of the Tests were out for delivery and that Plaintiff was "first on the list."

51. Unfortunately, and in Defendants' characteristic fashion, Plaintiff did not receive any Tests on January 11, 2022. After confronting Beach about the lack of delivery, Beach promised the Tests would be delivered on January 13, 2022. Whiplashed and disappointed by Defendants' constant deflections and ever-changing stories, Plaintiff contacted EN Corp. with the hope of finally receiving the Tests it should have received weeks ago.

52. On January 12, 2022, EN Corp.'s agent, Judy Roberts ("Roberts"), confirmed to Plaintiff that EN Corp. was working with Adaptiv, Beach and Sumner to procure the Tests for

Plaintiff and further confirmed that the Tests were "going to be delivered by tomorrow," as promised by Beach. Plaintiff responded by advising EN Corp. that it would notify its customer that the Tests would arrive the next day and requested that EN Corp. provide shipping documents when available.

53. The next day, January 13, 2022, Roberts discouraged Plaintiff from further contacting Sumner, stating "there is no need to send messages to Sumner as you all know from Benjamin [the CEO of EN Corp.] and myself and Gentry [Beach] that goods will be delivered today. We value our relationship with Sumner."

54. Later on January 13, 2022, Beach represented to Plaintiff that he had "some pallets [of Tests] for you." Indeed, Beach claimed that Adaptiv could provide Plaintiff with COVID-19 tests that had been ordered by "Don Jr." (*i.e.*, Donald Trump, Jr.). Plaintiff advised that it wanted the Tests that Plaintiff had ordered, which were now weeks past due.

55. On January 14, 2022, Beach represented to Plaintiff that "some of your pallets" would be delivered to Plaintiff in New York. Plaintiff provided Beach with shipment information and Beach purported to confirm that the "New York pallets are set up for our pickup today at 230 [sic]. We will then start delivering to you." Plaintiff advised its warehouse to expect the Tests and waited to receive delivery, but the Tests did not come.

56. Instead, Plaintiff discovered that its competitors were receiving pallets of Tests that should have been delivered to Plaintiff. It now appeared that Defendants had finally procured some of the Tests that Sumner and Ekstedt falsely represented they already owned, but Defendants were now selling them to the highest bidder in a desperate cash grab while not delivering to Plaintiff and keeping Plaintiff's funds for themselves.

57. Despite another week of more false promises by Defendants regarding delivery of the Tests, to date, Defendants have not provided the full amount of Tests that Plaintiff ordered and have failed to refund Plaintiff its money.

58. Defendants, upon information belief, have converted and misused the majority of Plaintiff's funds for their own personal benefit by dividing the funds among themselves and a network of shell companies, including Global Health and Ekstedt Enterprises, and have no intention of refunding Plaintiff's money.

59. As a result of Defendants' fraudulent scheme, breaches, and other misconduct, Plaintiff has been unable to meet its commitments to provide Tests to its customer, of which Defendants were fully aware, and, in addition to the $608,580 stolen by Defendants, has lost profits in the amount of at least $312,520 and incurred increased financing costs in the amount of $43,426.16, which amount increases by the day.

## AS AND FOR A FIRST CLAIM FOR RELIEF
**(Fraud Against Defendants)**

60. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

61. As set forth above, Defendants fraudulently induced Plaintiff to enter into the Agreement by making materially false and misleading representations of then-existing fact, and omitting material information peculiarly within Defendants' knowledge.

62. Defendants had actual knowledge of the materially false and misleading representations and omissions in their communications with Plaintiff, including that they did not own the Tests that were purportedly stored at iHealth's California warehouse. In the alternative, Defendants had a reckless disregard of the materially false and misleading representations and omissions contained therein.

63. Defendants were aware that, given their proclaimed expertise and experience in procuring and delivering at-home COVID-19 test kits, that Plaintiff would rely upon Defendants' representations in determining to wire funds to Defendants and enter into the above-described transaction.

64. Plaintiff was unaware of, and could not have discovered through the exercise of reasonable diligence, Defendants' materially false and misleading representations and omissions.

65. As set forth above, Sumner is the Chief Executive Officer of Sumner Group Health and Ekstedt is the President of Nanoed and manager of Ekstedt Enterprises, through which he controls Global Health.

66. As set forth above, at the direction of Ekstedt, the Ekstedt Entities use each other's funds and assets for their own purposes and for the personal benefit of Ekstedt, and are not treated as independent profit centers.  The Ekstedt Entities do not have independent business discretion and are controlled and dominated by Ekstedt, commingle funds among each other, do not deal with each other at arm's length, pay and guarantee the debts of each other, and use each other's property as if it were their own.  Moreover, the Ekstedt Entities share office space, personnel, and employees, including Jenny Capri and Ekstedt.  Ekstedt, in connection with Sumner, used the Ekstedt Entities as vehicles to perpetrate Defendants' fraud by giving the transaction the veneer of legitimacy to convince Plaintiff to transfer its funds to a United States-based company.  As such, Ekstedt dominated the Ekstedt Entities with respect to its transaction and dealings with Plaintiff to injure Plaintiff and Ekstedt and the Ekstedt Entities are alter egos.

67. As a direct and proximate result of Defendants' fraud, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $964,526.16, plus costs, interest, expenses, and attorneys' fees in amounts to be determined at trial.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**(Aiding and Abetting Fraud Against Sumner, Sumner Health Group, Ekstedt, Ekstedt Enterprises, Nanoed, Beach, Adaptiv and EN Corp.)**

68. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

69. In the alternative that the Court does not find that Sumner, Sumner Health Group, Ekstedt, Ekstedt Enterprises, Nanoed, Beach, Adaptiv and EN Corp. directly defrauded Plaintiff, as set forth above, Sumner, Sumner Health Group, Ekstedt, Ekstedt Enterprises and Nanoed, Beach, Adaptiv and EN Corp. aided and abetted the fraud committed by Global Health.

70. As set forth above, Sumner, Sumner Health Group, Ekstedt, Ekstedt Enterprises, Nanoed, Beach, Adaptiv and EN Corp. knowingly participated in the fraud and provided substantial assistance by knowingly providing false and fraudulent information and communications to Plaintiff with the knowledge that Plaintiff would rely on such fraudulent information.

71. As set forth above, Ekstedt and the Ekstedt Entities are alter egos.

72. As a direct and proximate result of Sumner, Sumner Health Group, Ekstedt, Ekstedt Enterprises, Nanoed, Beach, Adaptiv and EN Corp.'s misconduct, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $964,526.16, plus costs, interest, expenses and attorneys' fees in amounts to be determined at trial.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
**(Breach of Contract Against Ekstedt and the Ekstedt Entities)**

73. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

74. As set forth above, Plaintiff and Global Health entered into a valid and binding agreement.

75. As set forth above, Plaintiff fully performed under the parties' agreement.

76. As set forth above, Global Health breached the parties' agreement.

77. As set forth above, the Ekstedt Entities are alter egos.

78. As a direct and proximate result of the Ekstedt Entities breach of the parties' agreement, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $964,526.16, plus costs, interest, expenses, and attorneys' fees in amounts to be determined at trial.

**AS AND FOR A FOURTH CLAIM FOR RELIEF**
**(Breach of Contract Against Defendants)**

79. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

80. As set forth above, Plaintiff and Global Health entered into a valid and binding agreement.

81. Sumner, Sumner Health Group, Ekstedt and the Ekstedt Entities entered into agreements with EN Corp. and Adaptiv pursuant to which Sumner, Sumner Health Group, Ekstedt and the Ekstedt Entities transferred, or caused to be transferred, some portion of Plaintiff's funds to EN Corp. and Adaptiv and EN Corp. and Adaptiv were required to provide the Tests to Plaintiff (the "EN Corp./Adaptiv Agreements").

82. The EN Corp./Adaptiv Agreements were intended to benefit Plaintiff and such benefit to Plaintiff is sufficiently immediate to the EN Corp./Adaptiv Agreements.

83. As set forth above, EN Corp. and Adaptiv failed to fully perform and failed to deliver the Tests to Plaintiff and Plaintiff has been deprived of its intended benefits under the EN Corp./Adaptiv Agreements.

84. As set forth above, the Ekstedt Entities are alter egos.

85. As a direct and proximate result of Defendants breach of the EN Corp./Adaptive Agreements, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $964,526.16, plus costs, interest, expenses, and attorneys' fees in amounts to be determined at trial.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Money Had and Received Against Defendants)

86. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

87. As set forth above, Defendants received $608,580 belonging to Plaintiff and Defendants have benefitted from receipt of Plaintiff's money.

88. In the alternative that the Court does not find that a contract existed between Plaintiff and any of the Defendants, the Court should find that principles of equity and good conscience do not permit Defendants to retain the $608,580 paid by Plaintiff.

89. As a direct and proximate result of Defendants' misconduct, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $608,580, plus costs, interest, expenses, and attorneys' fees in amounts to be determined at trial.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment Against Defendants)

90. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

91. As set forth above, Defendants have been unjustly enriched at Plaintiff's expense.

92. In the alternative that the Court does not find that a contract existed between Plaintiff and any of the Defendants, the Court should find that principles of equity and good conscience do not permit Defendants to retain the $608,580 paid by Plaintiff.

93. As a direct and proximate result of Defendants misconduct, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $608,580, plus costs, interest, expenses, and attorneys' fees in amounts to be determined at trial.

## JURY DEMAND

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby requests that the Court grant the following relief:

a. Judgment in Plaintiff's favor and against Defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $964,526.16, plus pre-judgment interest;

b. Plaintiff's costs and disbursements incurred in this suit;

c. Plaintiff's attorneys' fees to the full extent permitted by law; and

d. Any such other and further relief as the Court may deem just and proper.

Dated: New York, New York
January 28, 2022

By: /s/ Glen Lenihan
Terrence A. Oved, Esq.
Darren Oved, Esq.
Glen Lenihan, Esq.
Andrew Kincaid, Esq.
OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013
Tel: 212.226.2376